**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|   |   |   |
|---|---|---|
| EMPOWER HEALTH LLC, ET AL. | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 3:10-CV-1163 (JCH) |
|  | : |  |
| v. | : |  |
|  | : |  |
| PROVIDENCE HEALTH SOLUTIONS | : | JUNE 3, 2011 |
| LLC, | : |  |
| Defendant. | : |  |

**RULING RE: MOTION TO DISMISS [Doc. No. 12]**

## I.    INTRODUCTION

On July 27, 2010, plaintiffs Empower Health, LLC ("Empower Health") and Daniel

Dunlop filed this suit against defendant Providence Health Solutions, LLC ("PHS"),

alleging breach of contract; conversion; statutory theft; violations of the Connecticut

Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110 et seq.; breach of the

covenant of good faith and fair dealing; promissory estoppel; and unjust enrichment.

Compl. (Doc. No. 1).   The plaintiffs also demanded an accounting under the alleged

contract between the parties.   Id. at 8.  On September 28, 2010, PHS filed a Motion to

Dismiss all counts of the Complaint for failure to state a claim pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure.  Mot. to Dismiss (Doc. No. 12).

On December 16, 2010, with the court's permission, plaintiffs filed an Amended

Complaint (Doc. No. 33).  In the Amended Complaint, the plaintiffs voluntarily withdrew

the counts sounding in conversion and statutory theft.   See Pl.'s Mot. for Leave to

Amend (Doc. No. 29) , at 1.  Among other changes, the Amended Complaint also added

factual allegations in support of the claims for breach of contract, breach of the

covenant of good faith and fair dealing, violations of CUTPA, and unjust enrichment.  Id. at 2.

The Amended Complaint does not remedy all of the alleged defects articulated in PHS's Motion to Dismiss.  The court will deem the Motion to be addressed to the Amended Complaint.  "[D]efendants should not be required to file a new motion to dismiss simply because an amended pleading was introduced while their motion was pending.  If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading.  To hold otherwise would be to exalt form over substance."  6 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 1476 (2010); <u>see also</u> <u>Charlton v. State of New York</u>, No. 03 Civ. 8986(LAK), 2006 WL 406315, *1 (S.D.N.Y. Feb. 22, 2006); <u>Tomney v. Int'l Ctr. for the Disabled</u>, No. 02 Civ. 2461(DC), 2003 WL 1990532, *1 (S.D.N.Y. Apr. 29, 2003).

## II.     STANDARD OF REVIEW

Upon a motion to dismiss pursuant to Rule 12(b)(6), the court must determine whether the plaintiff has stated a legally-cognizable claim by making allegations that, if true, would show he is entitled to relief.  <u>See</u> <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 557 (2007) (interpreting Rule 12(b)(6), in accordance with Rule 8(a)(2), to require allegations with "enough heft to 'sho[w] that the pleader is entitled to relief'").  The court takes the factual allegations of the complaint to be true, <u>Hemi Group, LLC v. City of New York</u>, 130 S. Ct. 983, 986-87 (2010), and from those allegations, draws all reasonable inferences in the plaintiff's favor, <u>Fulton v. Goord</u>, 591 F.3d 37, 43 (2d Cir. 2009).

To survive a motion pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S. Ct. at 1949 (2009) (quoting Twombly, 550 U.S. at 556).

The plausibility standard does not impose an across-the-board, heightened fact pleading standard. Boykin v. KeyCorp, 521 F.3d 202, 213 (2d Cir. 2008). The plausibility standard does not "require[] a complaint to include specific evidence [or] factual allegations in addition to those required by Rule 8." Arista Records, LLC v. Doe 3, 604 F.3d 110, 119 (2d Cir. 2010); see Erickson v. Pardus, 551 U.S. 89, 94 (2007) (holding that dismissal was inconsistent with the "liberal pleading standards set forth by Rule 8(a)(2)"). However, the plausibility standard does impose some burden to make factual allegations supporting a claim for relief. As the Iqbal court explained, it "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." Iqbal, 129 S. Ct. at 1949 (citations and internal quotations omitted).

Under the Second Circuit's gloss, the plausibility standard is "flexible," obliging the

plaintiff "to amplify a claim with some factual allegations in those contexts where such

amplification is needed to render the claim plausible." Boykin, 521 F.3d at 213 (citation

omitted); accord Arista Records, 604 F.3d at 120.

### III.    FACTUAL BACKGROUND[1]

Empower Health is a Connecticut Limited Liability Company, with a principal

place of business in Connecticut.  Am. Compl., ¶ 4.  Daniel Dunlop is a physician and

Empower Health's "principal."  Id.  PHS is a Rhode Island Limited Liability Company,

with a principal place of business in Rhode Island.  Am. Compl., ¶ 5.  PHS is a

"corporate wellness company offering team-based wellness software and consulting

services."  Id.

On June 15, 2008, Empower and PHS entered into a contract (the "Agreement")

in which Empower promised to promote PHS products in exchange for sales

commissions.  Am. Compl., ¶¶ 7-10.  The Agreement provides two principal ways for

Empower Health to earn sales commissions for its promotional efforts.  Am. Compl., ¶

10.  First, "[f]or each product/program that Empower Health LLC closes for a PHS

product, a sales commission of 10% of the net sales revenue collected shall be paid to

Empower Health LLC."  See Providence Health Solutions, LLC Marketing Agreement

(Doc. No. 13, Ex. A) (hereafter "Agreement") at § 4.  Second, Empower Health may also

earn sales commissions for "products sold through partnerships and relationships with,

as examples, . . . third party administrators, broker networks, health carriers,

_____

[1]  Taking the factual allegations in the Complaint as true, and drawing all reasonable
inferences in favor of Empower Health, the court assumes the following facts for the purposes of
the Motion to Dismiss.

technology companies, wellness and disease management vendors, and other financial institutions," if Empower Health has "provided an introduction to PHS" and the partner organization also receives a referral commission.  <u>Id.</u>  In addition, Empower Health receives renewal commissions for any products "closed by Empower Health" that are renewed in subsequent years.  Agreement, § 5.  The Agreement also provides: "Neither party will have the authority to enter into contracts, assume, create or incur any obligation or liability or make agreements of any nature whatsoever for, in the name of, or on behalf of, the other party."  Agreement, § 10.

Empower Health generated multiple leads for PHS.  Am. Compl., ¶ 14.  Empower Health devoted resources to converting those leads into PHS customers.  <u>Id.</u>  Empower Health also devoted resources to leads referred to Empower Health by PHS.  <u>Id.</u>  However, PHS attempted to thwart Empower Health's ability to earn commissions under the Agreement by directly contacting leads, thereby preventing Empower Health from being the entity that officially closed given transactions.  Am. Compl., ¶ 15.  PHS also assigned several of Empower Health's leads to other salespersons with the same purpose of interfering with Empower Health's rights under the Agreement.  <u>Id.</u>  PHS intentionally prevented Empower Health from pursuing 150 leads by assuming control over the relationship with the leads, removing Empower Health's access to the "Sales Force system," and by terminating Empower Health's e-mail account.  Am. Compl., ¶¶ 17-18.

At some point, PHS secured a lucrative contract with Aetna.  Am. Compl., ¶ 21.  Dunlop previously worked as a project manager for Aetna and, as a consequence, had developed useful connections with fellow Aetna employees.    Am. Compl., ¶ 6.

Empower Health's leads included Aetna, and PHS promised Empower Health that it would receive commissions on the Aetna contract starting in April 2010, from which the court draws the reasonable inference that PHS believed Empower Health was responsible for closing this sale. Am. Compl. ¶¶ 20-21. PHS has failed to pay Empower Health for several commissions Empower Health asserts it is owed under the Agreement, including Aetna, and PHS has indicated that it will never voluntarily make those payments. Am. Compl., ¶ 24.

At some point in time, Empower Health expressed concern to PHS that PHS was intentionally frustrating Empower Health's performance under the Agreement. Am. Compl., ¶ 20. In order to induce Empower Health to continue its efforts to develop leads for PHS products, PHS promised Empower Health's principal (Dunlop) that PHS would hire him as a full-time employee starting in January 2009. Am. Compl., Count Six, ¶¶ 25-26. PHS expected that Dunlop would rely on that promise, and Dunlop continued to work for Empower Health from September 2008 through December 2008 on the basis of PHS's promise. Id.

The Agreement provides the parties with the right to "examine or audit" those records that were maintained "to substantiate all amounts paid or owed to the other Party pursuant to the Agreement." Agreement, § 7. Empower Health now demands an accounting under the Agreement. Am. Compl., Count Five, ¶ 26.

## IV.    DISCUSSION

PHS filed a Motion to Dismiss all counts of the Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The plaintiffs' Amended Complaint voluntarily withdrew the conversion and statutory theft counts.

Therefore, the defendant's Motion to Dismiss is terminated as moot as to those two counts. For each remaining count in the Amended Complaint, the court addresses whether the plaintiffs' claims survive the Motion to Dismiss.

      A.    <u>Count One: Breach of Contract</u>

"The elements of a breach of contract action are [1] the formation of an agreement, [2] performance by one party, [3] breach of the agreement by the other party[,] and [4] damages." <u>American Express Centurion Bank v. Head</u>, 115 Conn. App. 10, 15-16 (2009) (citation omitted). PHS contends that the plaintiffs' breach of contract claim fails because the plaintiffs have not adequately alleged the third element by failing to state a provision of the Agreement violated by PHS. Mem. in Supp. (Doc. No. 13), at 5. Specifically, PHS argues that the plaintiffs never "allege that Empower actually **closed** a sale for a PHS product or introduced PHS to a partnership organization that receives a referral commission from a sale." <u>Id.</u> (emphasis in original).

To determine whether the plaintiffs have alleged that Empower Health "closed" the sale of a PHS product or program, we must consider the potential interpretations of the term "closed" as used in the Agreement. The Agreement specifically provides that "[n]either Party will have the authority to enter into contracts, assume, create or incur any obligation or liability or make agreements of any nature whatsoever for, in the name of, or on behalf of, the other Party." Agreement, § 10. In light of the foregoing limitation, the parties could not have meant that "closing" a sale required Empower Health to execute a contract on behalf of PHS with a purchaser. To interpret "closing" in that fashion would render PHS's promise to pay sales commissions illusory, and the "tendency of the law is to avoid the finding that no contract arose due to an illusory

promise when it appears the parties intended a contract." Sicaras v. City of Hartford, 44 Conn. App. 771, 780 (1997) (citing Corbin, Contracts, § 5.28, at 149). The plaintiffs plead that PHS and Empower entered into a contract. See Am. Compl., at ¶ 6. Taking the factual allegations in the Complaint as true, and drawing all reasonable inferences in favor of the plaintiffs, the court finds that the parties intended a contract, and the parties therefore could not have intended Section 10 – which precludes Empower Health from entering into contracts on behalf of PHS – to also prevent Empower Health from earning commissions for closing the sale of PHS products or programs.

Thus, the section of the Agreement providing sales commissions for "each product/program that Empower Health LLC closes for a PHS product" does not require Empower Health to execute a contract on behalf of PHS. However, the language of the Agreement does not elucidate what is required for Empower Health to "close" on a PHS product. "A contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." Oscai v. Exit 88 Hotel LLC, 127 Conn. App. 731, 736 (2011) (citation omitted). In addition, "[i]f the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." Id. at 736-37 (citation omitted). In this Agreement, the term "close" has a number of reasonable interpretations. For Empower Health to close a PHS product or program could mean that Empower Health has concluded negotiation about that product or program. See Webster's II New College Dictionary 211 (1995) ("Closed, closing, closes . . . 8b. To cease negotiations about"); Black's Law Dictionary 290 (9th ed. 2009) ("Close . . . 2. To conclude discussion or negotiation about."). Under this interpretation, Empower Health would negotiate the sale of the PHS product, and PHS would formally

complete the transaction with the customer. Alternatively, for Empower Health to close the sale of a PHS product might simply mean that a "Selected Customer" has purchased a PHS product after Empower Health promoted the product to that customer, presumably convincing the customer to purchase the product. This interpretation is supported by the description of Empower Health's duties in other sections of the Agreement, including Section One, in which "Empower Health LLC agrees to promote PHS and PHS Products to Selected Customers."

Because the intent of the parties in utilizing the term "close" is not clear and certain from the language of the Agreement, the court concludes that the contract is ambiguous. "When the language of a contract is ambiguous, . . . the determination of the parties' intent is a question of fact." Connecticut Nat'l Bank v. Rehab Associates, 300 Conn. 314, 319 (2011) (citation omitted). At the Motion to Dismiss stage, the court must take the factual allegations in the Complaint as true, and draw all reasonable inferences in favor of Empower Health. Heeding this requirement, the court assumes for the purposes of the Motion that closing the sale of a PHS product means that a customer assigned to Empower Health purchased a PHS product after Empower Health successfully promoted PHS products to that customer.

At some point during the contractual relationship, PHS secured a lucrative contract with Aetna. Am. Compl., ¶ 21. Empower Health's leads included Aetna, and PHS promised Empower Health that it would receive commissions on the Aetna contract starting in April 2010, from which the court draws the reasonable inference that Aetna had purchased this product after Empower Health promoted the product to Aetna. Am. Compl. ¶¶ 20-21. Given the foregoing allegations, Empower Health has

adequately pled facts, which if accepted as true, state a claim to relief for breach of contract that is plausible on its face.  PHS's Motion to Dismiss the plaintiffs' breach of contract claim is denied.

B.    Count Two: Violation of CUTPA

PHS argues that the Amended Complaint fails to state a CUTPA claim. Specifically, defendants contend (1) that the Amended Complaint fails to plead the CUTPA claim with specificity; (2) that the Amended Complaint does not allege that PHS's actions caused injury to anyone other than the plaintiffs;  (3) that the Amended Complaint does not allege the "sufficient aggravating circumstances" necessary to convert a claim for breach of contract into a valid CUTPA claim; and (4) that the Amended Complaint does not allege that the plaintiffs suffered an ascertainable loss as a result of PHS's conduct.  Mem. in Supp., at 7-10.

1.    Pleading with Particularity

PHS asserts that plaintiffs' failure to plead their CUTPA claim with particularity requires dismissal.  Mem. in Supp., at 8.  Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, plaintiffs in federal court generally need not plead with particularity. Rule 9(b), which establishes the heightened pleading standard for fraud claims, is an exception.  However,

> It is well established that CUTPA claims need not contain the elements of fraud. See e.g., Associated Inv. Co. Ltd. P'ship v. Williams Assocs. IV, 230 Conn. 148, 158, 645 A.2d 505 (Conn.1994); Sportsmen's Boating Corp. v. Hensley, 192 Conn. 747, 755, 474 A.2d 780 (Conn.1984). Thus, CUTPA claims brought in federal court only must satisfy Rule 9(b) if such claims are based on fraud allegations.  See, e.g., U.S. ex rel. Polied Envtl. Svcs., Inc. v. Incor. Group, Inc., 238 F.Supp.2d 456, 463 (D.Conn.2002) ("[A]lthough the Connecticut courts have required CUTPA claims to be pled with particularity, this procedural requirement does not apply in federal court.")

<u>Tatum v. Oberg</u>, 650 F. Supp. 2d 185, 195 (D. Conn. 2009). Plaintiffs have not alleged

facts that constitute fraud by PHS: they have alleged facts that constitute unfair

practices. Therefore, plaintiffs were not required to plead their CUTPA claim with

particularity.[2]

        2.      Injury to Third Parties

In deciding whether a practice violates CUTPA, the Connecticut Supreme Court

has adopted – and continues to adhere to – the criteria set out in the "cigarette rule"

articulated by the Federal Trade Commission:

> (1) Whether the practice, without necessarily having been previously considered
> unlawful, offends public policy as it has been established by statutes, the
> common law, or otherwise-in other words, it is within at least the penumbra of
> some common law, statutory, or other established concept of unfairness; (2)
> whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it
> causes substantial injury to consumers, competitors or other businesspersons.

<u>Harris v. Bradley Memorial Hospital and Health Ctr., Inc.</u>, 296 Conn. 315, 350 (2010)

(citation and internal quotation marks omitted).

Defendants correctly observe that the Amended Complaint does not allege that

PHS's actions caused injury to anyone other than the plaintiffs, and defendants argue

that the plaintiffs have therefore have failed to satisfy the third prong of the cigarette

rule. <u>See</u> Mem. in Supp., at 9. However, "[a]ll three criteria do not need to be satisfied

to support a finding of unfairness. A practice may be unfair because of the degree to

which it meets one of the criteria or because to a lesser extent it meets all three."

<u>Harris</u>, 296 Conn. at 350-51. Indeed, "one element alone can be the basis of a CUTPA

---

[2] Even if this action had been brought in Connecticut Superior Court, no requirement
exists under Connecticut law that CUTPA claims be plead with particularity. <u>See</u> <u>Macomber v.</u>
<u>Travelers Property and Casualty Corporation</u>, 261 Conn. 620, 644 (2002) ("We are
unpersuaded that there is any special requirement of pleading particularity connected with a
CUTPA claim, over and above any other claim.").

violation." Hartford Elec. Supply v. Allen-Bradley Co., 250 Conn. 334, 369 (1999).

Moreover, a single act can be sufficient to violate CUTPA, even if that act is an isolated

instance of misconduct.  See Johnson Electric Co. v. Salce Contracting Associates, 72

Conn. App. 342, 344 (2002).  CUTPA is a "remedial statute" and if there is "any

plausible doubt about the conduct that the statute makes actionable, the remedial

purpose of the statute persuades us that such doubts should be set aside to permit

recovery by the plaintiff."  Id. at 353.  The plaintiffs' failure to allege that PHS's actions

caused injury to anyone other than the plaintiffs does not invalidate their CUTPA claim.

### 3. Sufficient Aggravating Circumstances

Simple breach of contract is not sufficient to establish a violation of CUTPA,

"particularly where the count alleging [violation of] CUTPA simply incorporates by

reference the breach of contract claim and does not set forth how or in what respect the

defendant's activities are either immoral, unethical, unscrupulous or offensive to public

policy."  See Boulevard Associates v. Sovereign, 72 F.3d 1029, 1038-39 (2d Cir. 1995);

see also  Halo Technology Holdings, Inc. v. Cooper, No. 3:07CV489(SRU), 2010 WL

1330770, *6-*7 (D. Conn. Mar. 31, 2010).  For a breach of contract to constitute a

CUTPA violation, the breach must be accompanied by "[s]ignificant aggravating

circumstances."  Halo Technologies, 2010 WL 1330770, at *7.  PHS maintains that the

plaintiffs have not pleaded "sufficient aggravating circumstances beyond a mere breach

of contract to adequately state a claim for a violation of CUTPA."  Mem. in Supp., at 8

(citing Aztec Energy Partners, 531 F. Supp. 2d 226, 232 (D. Conn. 2007)) (internal

quotation marks omitted).

The Connecticut Supreme Court has held that a party's refusal to perform under a valid contract while retaining the benefits of that contract constitutes a breach accompanied by significant aggravating circumstances. Saturn Const. Co. Inc. v. Premier Roofing Co., 238 Conn. 293, 310 (1996) (defendant validly stated a CUTPA violation where "defendant contended that the plaintiff had refused to pay money due under the contract without foundation and had asserted a frivolous counterclaim"); see also Robert M. Langer, John T. Morgan, & David L. Belt, Connecticut Unfair Trade Practices, Business Torts and Antitrust 329 (2010-11 ed.). In this case, the plaintiffs allege that Empower Health performed significant promotional services on behalf of PHS, but PHS refused to compensate Empower Health as required under the Agreement, thereby requiring Empower Health to resort to litigation to obtain relief. Plaintiffs further allege that PHS intentionally frustrated the ability of Empower Health to earn commissions by directly contacting Empower Health's leads after Empower Health devoted resources to developing those leads; by removing Empower Health's access to the "Sales Force system"; and by terminating Empower Health's e-mail account. Following Saturn Construction Co. Inc., these allegations go beyond a mere breach of contract allegation and are sufficient to state a claim under CUTPA.

Similarly, the District Court of Connecticut has held that a plaintiff may state a claim for a violation of CUTPA by alleging that a contract was breached in bad faith. See Stetzer v. Dunkin' Donuts, Inc., 87 F. Supp. 2d 104, 114-15 (D. Conn. 2000). For the reasons discussed below, in section IV.C., the plaintiffs have alleged facts that support the conclusion that PHS breached the contract in bad faith.

13

Finally, the Connecticut Supreme Court has held that actions which exhibit a "reckless disregard" for the contractual rights of another party are sufficient to support an award of punitive damages under CUTPA.  Tessman v. Tiger Lee Construction Co., 228 Conn. 42, 54 (1993).  In Tessman, the record contained evidence that a contractor "[1] represented that it would perform all work with its own employees, but instead relied completely on subcontractors, and refused to try to fix leaks, claiming they were 'merely condensation'; [2] told homeowners to set traps to solve problem of rodents entering through hole in wall; and [3] buried paint cans and 'other noxious materials . . . in a wetland near [the home's] well."  Naples v. Keystone Building and Development Corp., 295 Conn. 214, 229-30 (2010) (discussing Tessman).  Here, Empower Health and Dunlop allege that PHS has recklessly disregarded its contractual obligations by failing to pay commissions due under the Agreement.  See supra, at 13.

Thus, accepting the facts in the Amended Complaint as true, the plaintiffs have properly alleged sufficient aggravating circumstances with their breach of contract claim to validly state a claim for relief under CUTPA.

4.    Ascertainable Loss

PHS asserts that the plaintiffs fail to allege an "ascertainable loss" as a result of PHS's conduct, as required by Conn. Gen. Stat. § 42-110g(a).  This argument is without merit.  "The words 'any ascertainable loss' do not require a plaintiff to prove a specific amount of actual damages in order to make out a prima facie case. Under CUTPA, there is no need to allege or prove the amount of the ascertainable loss.  On its face, the loss of a contract is an ascertainable loss."  Johnson Electric Co. v. Salce Contracting Associates, Inc., 72 Conn. App. 342, 354-55 (2002) (citations and

alterations in the original omitted).  The plaintiffs have alleged specific contractual

losses that may be ascertained after the audit provided under section 7 of the

Agreement.

      C.     <u>Count Three: Breach of the Covenant of Good Faith and Fair Dealing</u>

The implied covenant of good faith and fair dealing requires "that neither party [to

a contract] do anything that will injure the right of the other to receive the benefits of the

agreement."  <u>De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.</u>, 269 Conn. 424, 432

(2004) (citation omitted). To establish a breach of the implied covenant of good faith and

fair dealing, "the acts by which a defendant allegedly impedes the plaintiff's right to

receive benefits that he or she reasonably expected to receive under the contract must

have been taken in bad faith."  <u>Renaissance Management Co., Inc. v. Connecticut</u>

<u>Housing Finance Authority</u>, 281 Conn. 227, 240 (2007) (citation omitted).  PHS

contends that the plaintiffs have not adequately alleged that PHS acted with bad faith.

Mem. in Supp., at 11-12.

"Bad faith in general implies both actual or constructive fraud, or a design to

mislead or deceive another, or a neglect or refusal to fulfill some duty or some

contractual obligation, not prompted by an honest mistake as to one's rights or duties,

but by some interested or sinister motive. . . . Bad faith means more than mere

negligence; it involves a dishonest purpose."  <u>De La Concha of Hartford, Inc.</u>, 269 Conn.

at 433 (citation omitted).  "The common-law duty of good faith and fair dealing implicit in

every contract . . . is a rule of construction designed to fulfill the reasonable

expectations of the contracting parties as they presumably intended."  <u>Harley v. Indian</u>

Spring Land Co., 123 Conn. App. 800, 837 (2010). Bad faith includes "evasion of the spirit of the bargain." Landry v. Spitz, 102 Conn. App. 34, 43 (2007).

In this case, the Amended Complaint alleges that PHS acted intentionally to frustrate Empower Health's right to receive the benefits of the Agreement by preventing Empower Health from closing on sales that Empower Health initiated. The Amended Complaint alleges that PHS deliberately prevented Empower Health from pursuing 150 leads by assuming control over the relationship with the leads, removing Empower Health's access to "the Sales Force system," and by terminating Empower Health's e-mail account. Empower Health could not reasonably have expected that PHS would actively interfere with the ability of Empower Health to earn commissions under the Agreement. Such conduct certainly evades the spirit of the bargain between the two companies, particularly in light of the fact that the sales commissions were the only compensation provided in the Agreement in consideration for Empower Health's promotional efforts. The court finds that the plaintiffs have plead sufficient facts to state a claim for breach of the implied covenant of good faith and fair dealing that is plausible on its face. PHS's Motion to Dismiss is denied as to Count Three of the Amended Complaint.

D.     Count Four: Tortious Interference with Business Expectations

Although the Amended Complaint contains a claim for tortious interference with business expectations, the plaintiffs' original Complaint did not contain this claim. As a consequence, PHS's Motion to Dismiss did not address this count, and the court does not address this Count at this time.

E.     Count Five: Accounting

PHS seeks to dismiss each of the causes of action plead in the original Complaint.  Mem. in Supp., at 1 ("each of the claims asserted by plaintiffs in their complaint is legally insufficient.").  However, PHS has not made "any argument challenging Empower's claim for an accounting under the agreement."  Mem. in Opp'n (Doc. No. 26), at 22.

"An 'accounting' is defined as an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due. An action for an accounting usually invokes the equity powers of the court, and the remedy that is most frequently resorted to ... is by way of a suit in equity."  Mankert v. Elmatco Products, Inc., 84 Conn. App. 456, 460 (2004).  "An accounting is not available in an action where the amount due is readily ascertainable."  Id.  To state a claim for accounting, a plaintiff must plead either "a fiduciary relationship, or the existence of a mutual and/or complicated accounts, or a need of discovery, or some other special ground of equitable jurisdiction such as fraud."  Id. (citation omitted) (emphasis in original).

The plaintiffs have alleged the existence of complicated accounts.  Section 7 of the Agreement specifically provides an audit right between the parties, reflecting the complicated nature of the commissions to be earned and paid under the Agreement. The Connecticut Appellate Court has also held that a sales commission contract can create the fiduciary relationship sufficient to give rise to a claim for an accounting. Mankert, 84 Conn. App. at 461.  The court, therefore, denies the Motion to Dismiss the plaintiffs' claim for an Accounting.

F.    Count Six: Promissory Estoppel

PHS disputes the sufficiency of the plaintiffs' claim for promissory estoppel.  To state a claim for promissory estoppel, the plaintiff must allege that it "change[d] its position in reliance on" statements or actions of the defendant which were "calculated or intended to induce another party to believe that certain facts exist and to act on that belief."  Abbott Terrace Health Center, Inc. v. Parawich, 120 Conn. App. 78, 86-87 (2010).  PHS contends that Empower Health was already obligated to perform under the Agreement and therefore the plaintiffs are unable to allege that PHS's promises induced reliance by the plaintiffs.  Mem. in Supp. at 12-13.

The plaintiffs respond by clarifying that only Dunlop, not Empower Health, makes a claim for promissory estoppel.  Mem. in Opp'n, at 20-22.  Specifically, the Amended Complaint alleges that Dunlop relied, to his detriment, on a promise by PHS that it would hire him on a full-time basis.  Am. Compl., Count Six, ¶ 27.  The plaintiffs admit that Empower Health was obligated to perform under the Agreement, but emphasize that Dunlop did not personally share this obligation.  Accepting the facts alleged in the Complaint as true, and making all reasonable inferences in favor of the plaintiff, the court agrees that Dunlop was not personally obligated to perform under the Agreement. Although Dunlop signed the agreement as Managing Partner of Empower Health, the Agreement does not specify any personal obligations for Dunlop.  Absent additional information, the court cannot conclude that Dunlop would have been personally liable for Empower Health's non-performance under the Agreement.[3]  Because Dunlop was

_____

[3] At trial, PHS may present evidence that Empower Health and Dunlop were interchangeable, that the corporate veil would have been pierced, and that Dunlop would have been personally liable for Empower Health's non-performance.  If PHS were able to establish

not personally required to perform under the Agreement, Dunlop changed his position in reliance on PHS's promise to provide future employment. Therefore, the court denies the Motion to Dismiss Dunlop's promissory estoppel count.[4]

G.    Count Seven: Unjust Enrichment

PHS asserts that the plaintiffs' unjust enrichment claim is barred because Empower Health entered into an express contract with PHS. A claim for unjust enrichment cannot succeed if the parties have entered into an express contract. See Lieberman v. Emigrant Mortgage Co., 436 F. Supp. 2d 357, 366 (D. Conn. 2006) ("Proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment.") However, plaintiffs are entitled to plead in the alternative. See Fed. R. Civ. P. 8(d)(2) ("a party may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count . . . or in separate ones."); Kruse v. Wells Fargo Home Mortg., Inc., 383 F.3d 49, 55 n.3 (2d Cir. 2004) (Federal Rules of Civil Procedure permit pleading inconsistent theories in the alternative); Adler v. Pataki, 185 F.3d 35, 41 (2d Cir. 1999) (Federal Rules of Civil Procedure provide "sufficient latitude to construe separate allegations in a complaint as alternative theories"). Although PHS acknowledges "that a plaintiff may plead in the alternative and seek recovery on

_____

these facts and legal conclusions, then Dunlop was personally obligated to perform under the Agreement, and he could not have changed his position in reliance on PHS's promises. The jury would be required to return a verdict for PHS on the promissory estoppel count.

[4] As discussed in Part IV.G., infra, plaintiffs are also entitled to plead in the alternative. If the Agreement was not enforceable, then Empower Health was not required to perform under the Agreement, and the plaintiffs could again properly assert that Dunlop changed his position in reliance on statements by PHS. In its Answer, PHS raises a number of affirmative defenses which rely upon the conclusion that the Agreement was not an enforceable contract. See Answer (Doc. No. 36), at 6-7.

inconsistent theories of liability,"[5] PHS nevertheless urges the dismissal of plaintiffs'

unjust enrichment claim because it "merely incorporates the breach of contract

allegations." Mem. in Supp. at 14 (citing Robinson Aviation, Inc. v. City of New Haven,

No. CV095032399S, 2010 WL 3025803 (Conn. Super. July 7, 2010)). "Some Superior

Court decisions . . . have stricken a party's unjust enrichment count where . . . the

party's unjust enrichment count incorporates by reference the breach of contract

allegations." Robinson Aviation, Inc., 2010 WL 3025803, at *2.

In response to PHS's Motion to Dismiss, the plaintiffs filed an Amended

Complaint. The Amended Complaint removes reference to the breach of contract

allegations in the unjust enrichment count. See Am. Compl., Count Seven; Compl.,

Count Eight. The plaintiffs now successfully allege an unjust enrichment cause of

action in the alternative. The plaintiffs' unjust enrichment claim could plausibly succeed

under the facts alleged in the Amended Complaint. Therefore, PHS's Motion to Dismiss

is denied as to the plaintiffs' unjust enrichment claim.

H.     Contractual Waiver of Certain Types of Damages

Finally, PHS argues that Empower Health cannot seek "indirect, special,

incidental, exemplary, multiple, punitive or consequential damages" due to a Limitation

of Liability clause in the Agreement. Mem. in Supp., at 4 (quoting Agreement, § 12).

Plaintiffs respond that, under certain theories in the Amended Complaint, the

Agreement may not constitute an enforceable contract, so the Limitation of Liability

clause would have no force or effect. The court agrees.

---

[5] Indeed, as noted above, PHS's Answer to the Amended Complaint offers several
affirmative defenses that, if proven, would show that no enforceable contract existed between
the parties.

Plaintiffs further argue that the Limitation of Liability clause may be unenforceable because PHS breached the contract in bad faith.  Mem. in. Opp'n, at 6.  "A defendant may be estopped from asserting a contractual limitation of consequential damages if the defendant has acted in bad faith."  Int'l Connectors Industry, Ltd. v. Litton Systems, Inc., Civ. A. No. B-88-505 (JAC),1995 WL 253089, *11 (D. Conn. Apr. 25, 1995) (quoting Long Island Lighting Co., 646 F. Supp. 1442, 1458-59 (S.D.N.Y. 1986)).  "A party may contract to limit liability in damages for nonperformance of promises. . . . Such a provision is not effective, however, if that party acts fraudulently or in bad faith."  Town of New Hartford v. Connecticut Resources Recovery Authority, 42 Conn. L. Rptr. 101, 2006 WL 2730965, *3 (Conn. Super. Sept. 11, 2006) (quoting Corbin on Contracts § 85.18 (LexisNexis 2010)).  As discussed in Part IV.C, supra, the Amended Complaint alleges that PHS breached the contract in bad faith.  The Amended Complaint, therefore, contains sufficient factual matter, accepted as true, to state a claim for the types of damages listed in the Limitation of Liability clause that is plausible on its face.

## V.    CONCLUSION

For the foregoing reasons, PHS's Motion to Dismiss **[Doc. No. 12]** is **terminated as moot in part** and **denied in part.**

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 3rd day of June, 2011.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge