**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| EMPOWER HEALTH, LLC and DANIEL DUNLOP | : | CIVIL NO. 3:10-cv-1163-JCH |
| v. | : | |
| PROVIDENCE HEALTH SOLUTIONS, LLC | : | APRIL 4, 2012 |

## PLAINTIFF'S LOCAL RULE 56(c) STATEMENT IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS

In support of its Motion for Summary Judgment, seeking judgment as a matter of law on Defendant's Counterclaims, and in accordance with D. Conn. L. Civ. R. 9(c)(1), Plaintiffs Empower Health, LLC and Daniel Dunlop ("Plaintiffs") contend that there are no genuine issues to be tried as to any material facts, and submit the following Statement of Undisputed Material Facts:

1. The Plaintiff, Empower Health, LLC is a Connecticut Limited Liability Company, with Plaintiff Daniel Dunlop as a member. (Dkt. 28, Amended Compl. at ¶4, Dkt. 112, Counterclaim at ¶6).

2. The Defendant, Providence Health Solutions, LLC ("PHS"), is a corporate wellness company offering team-based wellness software and consulting services under the SUTN brand name. (Dkt. 28, Amended Compl. at ¶5; Dkt. 112, Def.'s Answer at ¶5).

3. PHS and Empower executed a marketing agreement on June 15, 2008, a copy of which is attached to the Complaint as Exhibit A. (Dkt. 28, Amended Compl.

at ¶7; Dkt. 112, Def.'s Answer at ¶7; Dkt, 118-7, Def.'s Rule 56 Statement in Support of Its Motion for Summary Judgment, at ¶22).

4. Weinberg had business experience prior to starting PHS (Weinberg Depo. at p. 58, Exhibit A).

5. Weinberg's prior business experience included the following:

a. Weinberg started a company called "Interactive Solutions" in college designing websites, and also Event E-Management, which helped institutions including Brown University, Providence College, Duke University, URI and others. (Weinberg Depo. at 56-57, Exhibit A);

b. Weinberg was a founder and President of "Invest Together," a Brown University sponsored investment group. Weinberg used lawyers for Interactive Solutions and Event E-Management. (Weinberg Dep. At 59, Exhibit A).

6. Weinberg's father is an attorney. (Weinberg Dep. at 40, Exhibit A).

7. Both Weinberg and Kumar were accepted into Brown University Medical School while still in high school, and did not have to take the Medical Entrance Exams. (Kumar Dep. at 73, Exhibit B; Weinberg Dep. at 47, Exhibit A). Kumar even describes his business partner Weinberg as "often find[ing] himself as the smartest person in the room." (Kumar Depo. at 49, Exhibit B).

8. Kumar had business experience, as well as access to legal counsel, prior to starting PHS including the following:

a. When he was in high school, Kumar started a company -- with a business partner -- that sold posters on the internet called houseofposters.com, for which he filed a "dba" with the Town of Glastonbury, built a website complete with online store, and later sold that business on eBay for $4,000. (Id. at 19, 21, Exhibit B ).

b. While a Brown undergrad, Kumar started a 501(c )(3) nonprofit organization "Adopt A Doctor" to fund the salaries of doctors that work in poor countries. (Kumar Dep. at 22, Exhibit B). He completed the 501(c)(3) and also filed articles of incorporation with the secretary of state. His business partner in "Adopt A Doctor" was Ray Rickman, the former Deputy of State of Rhode Island and State Representative. (Kumar Dep. at 25, 33, Exhibit B).

c. In 2005, Kumar started "Shape Up Rhode Island" as a non-profit entity and used the services of an attorney in 2007 to address a legal claim arising out of the purchase of defective products. (Kumar Dep. at 30, Exhibit B). In 2006 and 2007, Kumar used Gordon Fox as agent for service for Shape Up Rhode Island, a Rhode Island legislator and practicing attorney, whom he had known since 2003. (Kumar Dep. at 57, Exhibit B). And even before Dunlop ever entered the picture, Kumar and Weinberg's business plan for Providence Health Solutions (or Shape Up) had won a contest, receiving $25,000 of "in-kind" legal services from a few high-powered law firms, including Ropes & Gray, Brown Rudnick and Hinckley Allen & Snyder. (Kumar Dep. at 175-176, Exhibit B ).

d.  Kumar received an undergraduate degree from Brown in economics, (Kumar Dep. at 18) and Weinberg received his from Brown in business economics. (Weinberg Dep. At 46).

9. April 2008, Providence had 20-40 customers. It generated 2008 revenue of about $700,000, largely from a contract it had with CVS Caremark, (Kumar Dep. At 65).

10. Over the course of a year, Kumar and Weinberg negotiated the contract with CVS Caremark. (Kumar Dep. At 66, 67).

11. The first contact between PHS (Kumar) and Dunlop was as a result of PHS's marketing campaign which included Aetna Insurance Company, where Dunlop worked. (Kumar Dep. at 70, Exhibit B ).

12. Kumar first spoke with Dunlop in April 2008, for about 20-40 minutes (Kumar Dep. At 41, Exhibit B), two months before signing the Marketing Agreement (with Weinberg) on or about June 15, 2008. (Amended Compl. at ¶7; Def.'s Answer at ¶7; Def.'s Rule 56 Statement in Support of Its Motion for Summary Judgment, at ¶22).

13. Kumar spoke with Dunlop probably a half dozen times between that first call and May 1, 2008 concerning Providence's product "Shape Up the Nation" and was speaking to other Aetna employees about Shape Up. (Kumar Dep. at 73, Exhibit B ).

14. Paul Coppola, was the person leading Aetna's process of looking at wellness vendors like Providence, (Kumar Dep. At 74), and Kumar knew Coppola had the most influence at Aetna surrounding that process. (Kumar Dep. At 75)

15. Prior to signing the Marketing Agreement, Kumar had conversations with Dunlop wherein Dunlop expressed an interest in Providence, its philosophy and in bringing sales to Providence as an independent consultant. (Kumar Dep. At 76).

16. Though Kumar thought that was odd, given Dunlop's employment with Aetna, Kumar did not discuss this with Paul Coppola or anyone else. (Kumar Dep. At 78).

17. Kumar did, however, mention to Dunlop his feelings about Dunlop being employed by Aetna and dealing with Providence independently (potentially an Aetna vendor) but, as Kumar testified, Dunlop told him "he was planning to leave Aetna." (Kumar Dep. At 78).

18. Kumar also recalled Dunlop telling him he was excited by a start-up company like Providence, and the opportunity to really make a difference. (Kumar Dep. at 78, Exhibit B).

19. Dunlop told Kumar that "he was planning to leave Aetna" but wanted something in place lined up. (Kumar Dep. At 78, Exhibit B). Kumar recalled that Dunlop told him these things – about his employment intentions – "very early on" and made it clear he was "intending to leave Aetna." (Kumar Dep. at 79, Exhibit B).

20. When Kumar asked Dunlop if he was still working at Aetna (because the communications were no longer through Dunlop's Aetna email account), Dunlop

told Kumar he had left in a reluctant fashion and had been fired. (Kumar Dep. at 80-81, Exhibit B ).

21. The first draft of the Marketing Agreement came after a meeting between Dunlop and Defendant's founders, Rajiv Kumar and Brad Weinberg, on May 12, 2008. (Weinberg Depo at 76, Exhibit A).

22. Hours after the parties' meeting on May 12, 2008, Weinberg went on the internet and found a boilerplate marketing agreement from one of a few stock legal document websites, (Weinberg Dep. at 77, 78, Exhibit A), and sent it to Kumar with the intent that Kumar forward it on to Dunlop as a draft marketing agreement. (Id.). (Exhibit C, (Exhibit 1 from Kumar's Deposition, Kumar Dep. at. 25).)

23. Dunlop did not ask Kumar or Weinberg to provide a draft the same day as the meeting nor did he impose a deadline, and Kumar said he saw exciting opportunities for them. (Kumar Dep. at 108, Exhibit B).

24. Weinberg did not expect Dunlop to request changes to the draft marketing agreement but Dunlop "came back quickly and asked for changes." (Weinberg Dep. at 79, Exhibit A).

25. There were several alterations of the draft marketing agreement between Mary 12, 2008 and June 15, 2008, when the Marketing Agreement was signed. (Kumar Dep. at 109, Exhibit B).

26. There were "back and forth" communications about contract language. (Kumar Dep. at 111, Exhibit B).

27. Kumar had time to comment on the agreement and could have called Attorney Gordon Fox or any lawyer to review it and nobody stopped him from doing that. (Kumar Dep. at 130, Exhibit B).

28. The extent of the unclear language that Dunlop "insisted" upon, was: the provision concerning "automatic renewal," (Section 5) "products sold through partnerships and relationships" (Section 4) "Term" (Section 8) and " To ensure accurate records of commissions owed Empower Health makes every efforts to serve as a conduit for new business." (Section 4), Products/programs closed by Empower Health that are renewed in subsequent years" ( Section 4). (Kumar Dep. at 124, Exhibit B).

29. Providence has no evidence of "overreaching" other than the usual contract discussion and negotiation between Kumar and Dunlop, leading up to the execution of the agreement; as Kumar said, they were "negotiating the agreement." (Kumar Dep. at 132, Exhibit B).  Kumar summed up Dunlop's "overreaching" and insistence upon unclear language as follows:

> **Mr. Minchella**: Did you feel that Mr. Dunlop had done anything unethical in adding any language to the Marketing Agreement that you and Mr. Weinberg signed?
> **Dr. Kumar:** How would you define "unethical?"
> Mr. Minchella: You can use the term as you understand it.
> **Dr. Kumar**: Okay. I think he inserted knowledge that he knew would be to his benefit. And inserted information that was, or language that was unclear. I won't interpret -- I won't -- I don't know how to describe that in a single adjective.
> **Mr. Minchella:** Isn't part of negotiation a party has an opportunity to insert language that benefits them?
> **Dr. Kumar:** Yes.

> **Mr. Minchella:** Is [Dunlop] supposed to insert language that only benefits Providence?
> **Dr. Kumar:** No.
> **Mr. Minchella:** Didn't you and Mr. Weinberg talk about language that would benefit Providence?
> **Dr. Kumar:** Yes.
> **Mr. Minchella:** You would want that in the agreement, right?
> **Dr. Kumar:** Correct.

(Kumar Dep. at 133-134, Exhibit B).

30. There is no evidence to support Providence's allegation at Paragraph 11 of its counterclaim that "Dunlop represented to Providence that by virtue of his position at Aetna he could damage its business relationship with Aetna if Providence did not cooperate with him personally," Kumar, who had the conversation with Dunlop where this alleged representation was made, testified when asked if Dunlop had made that statement, that:

> **Dr. Kumar:** I can't recall his exact words. He said something to the effect of: I am operating without a contract here. We need to get this replaced. And I am still at Aetna. Let's get this thing signed.
> **Mr. Minchella:** That is your best recollection of what he said?
> **Dr. Kumar:** Right.
> **Mr. Minchella:** You can't recall specifically?
> **Dr. Kumar:** No.

(Kumar Dep. At 89, Exhibit B).

31. "Nobody held a gun to [Kumar and Weinberg's] head and said sign this agreement. There is always a choice." (Kumar Depo at 99, Exhibit B).

THE PLAINTIFFS.
EMPOWER HEALTH LLC and
DANIEL DUNLOP



By:_____/s/ ct18890_____
 Anthony R. Minchella (ct18890)

Minchella & Associates, L.L.C.
530 Middlebury Road, Suite 209B
Middlebury, CT  06762
(203) 758-1069 (Telephone)
(203) 758-2074 (Facsimile)
aminchella@minchellalaw.com (E-Mail)

**CERTIFICATION**

I certify that on this date a copy of the foregoing Plaintiffs' First Motion, With Consent, For Enlargement Of Time To File Opposition To Defendant's Motion For Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the notice of electronic filing. Parties may access this filing through the Court's CM/ECF system.

Date: April 4, 2012                      /s/ ct18890
                                    Anthony R. Minchella