**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| EMPOWER HEALTH, LLC and | : | CIVIL NO. |
| | : | 3:10-cv-1163-JCH |
| DANIEL DUNLOP | : | |
| | : | |
| v. | : | |
| | : | |
| PROVIDENCE HEALTH | : | |
| SOLUTIONS, LLC | : | APRIL 16, 2012 |

<u>**PLAINTIFF'S LOCAL RULES 56(A)(2) STATEMENT OF MATERIAL FACTS**</u>

<u>**PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56 (A)(1) STATEMENT**</u>

Pursuant to D. Conn. L. Civ. R. 56(a)(2), Plaintiff Empower Health, LLC, submits its Local Rule 56(a)(2) Statement of Material Facts in opposition to Defendant, ShapeUp Inc. f/k/a Providence Health Solutions, LLC d/b/a Shape Up The Nation's, statement of undisputed material facts.

<u>**Undisputed Material Facts**</u>

1.      In August 2007, Brad Weinberg ("Weinberg") and Rajiv Kumar ("Kumar"), then 26 and 24 years old, respectively, suspended their studies at Brown University Medical School to start a business in Providence, Rhode Island. *Rajiv Kumar Deposition Transcript* ("*Kumar Tr"),* 52:25 - 54:3.

**RESPONSE:** Admitted.

2.      Weinberg and Kumar sought to use the power of social media to increase

the use of wellness programs at large corporations. *Id.,* 49:25 - 52:7.

    **RESPONSE:**  Admitted.

3.    The business was initially called Providence Health Solutions, LLC d/b/a Shape Up The Nation and has since been incorporated as Shape Up, Inc. (referred to together herein as "Providence"). *Michael Zani Deposition Transcript ("Zani Tr"),* 21:8-12.

    **RESPONSE:**  Admitted.

4.    Weinberg and Kumar had very limited previous business experience and no substantive experience with the law or legal agreements when they started Providence. *Affidavit of Rajiv Kumar* dated February 23,2012 *("Kumar Ajf.\* 1j 8.[3]

    **RESPONSE:** Denied.  Providence's counterclaims allege that Weinberg and Kumar had "neither prior business experience nor experience with the law or legal agreements when they started Providence". (Def.s' Counterclaim at ¶7). Weinberg had business experience prior to starting PHS (Weinberg Depo. at p. 58, Exhibit A hereto). Weinberg was a founder and President of "Invest Together," a Brown University sponsored investment group.  When he was in high school, Kumar started a company -- with a business partner -- that sold posters on the internet called houseofposters.com, for which he filed a "dba" with the Town of Glastonbury, built a website complete with online store, and later sold that business on eBay for $4,000. (Id. at 19, 21, Exhibit B) While a

2

Brown undergrad, Kumar started a 501(c )(3) nonprofit organization "Adopt A Doctor" to fund the salaries of doctors that work in poor countries.   (Kumar Dep. at 22, Exhibit B).   He completed the 501(c)(3) and also filed articles of incorporation with the secretary of state.   His business partner in "Adopt A Doctor" was Ray Rickman, the former Deputy of State of Rhode Island and State Representative.   (Kumar Dep. at 25, 33, Exhibit B).

5.      They also had limited funding and staff to run their venture, as well as minimal access to legal counsel. *Id.*

**RESPONSE:**   Admit they had limited funding. Denied as to the remainder. Weinberg used lawyers for Interactive Solutions and Event E-Management. (Weinberg Dep. At 59, Exhibit A). Kumar used Gordon Fox as agent for service for Shape Up Rhode Island, a Rhode Island legislator and practicing attorney, whom he had known since 2003.   (Kumar Dep. at 57, Exhibit B).    And even before Dunlop ever entered the picture, Kumar and Weinberg's business plan for Providence Health Solutions (or Shape Up) had won a contest, receiving $25,000 of "in-kind" legal services from a few high-powered law firms, including Ropes & Gray, Brown Rudnick and Hinckley Allen & Snyder.   (Kumar Dep. at 175-176, Exhibit B).

6.      Dunlop, a former chiropractor, was introduced to Kumar while Dunlop was working at Aetna Insurance Company ("Aetna"). *Daniel Dunlop Deposition Transcript*

(*"Dunlop* 7>."), 35:12-14, 70:5-17.[4]

    **RESPONSE:** Denied.   Dunlop still holds a chiropractic license.   Dunlop Tr. at 36.   And while Dunlop received an email "blast" from Providence while working at Aetna, he reached out and contacted Kumar. Dunlop Tr. at 70, Exhibit C).

    7.    In April 2008, Dunlop contacted Kumar via Providence's website, as an Aetna employee and on behalf of Aetna, to learn more about Providence as part of a vendor identification process that Aetna was running to select a partner to provide wellness programs for its clients. *Id.,* 70:15-71:16, 72:14-19; *Kumar Tr.,* 41:17-23,72:19-25.

    **RESPONSE:** Denied.   At the time Dunlop contacted Kumar, he was not on the team looking for services like those Providence provided.   Dunlop Tr. at 70, Exhibit C.   He was not on the search committee until after meeting with Kumar. Dunlop Tr. at 72, Exhibit C.   And Dunlop contacted Kumar because he personally had an interest in innovative healthcare companies.   The vendor identification process, or evaluation process, came later when Dunlop actively brought Providence to the attention of his colleagues who were involved in the Get Active Aetna Commercialization project. (Dunlop Aff. at ¶6).

    8.    Dunlop immediately floated the idea of leaving Aetna to do business with Providence and represented himself to Providence as a successful industry specialist who had a detailed knowledge of the wellness products market and many valuable contacts in

that area which he could use to assist Providence.   *Kumar Aff.,* ^ 10; *Kumar Tr.,* 76:10 -
77:7, 79:3-12; *see also Complaint,* 6.

     **RESPONSE:**   Admitted.


   9.    Dunlop previously declared personal bankruptcy (in which a lawsuit for
back rent against him was discharged), closed his chiropractic practice and was
terminated from his previous job (before Aetna) for lack of performance. *Dunlop Tr.,*
38:5-11, 101:6-24.

    **RESPONSE:**   Plaintiff denies the materiality of these facts.   Admit Dunlop
    declared personal bankruptcy.   Admit Dunlop closed his own chiropractic
    practice but he then continued to practice chiropractic elsewhere.   Deny that
    Dunlop was terminated for lack of performance because the transcript pages
    cited state "lack of production" which is a distinction with a difference; at the time
    Dunlop was not actively selling investments for the employer, Lincoln Financial,
    and therefore not producing, and so his NASD association with Lincoln as a
    broker dealer was terminated. Dunlop Tr. at 38, Exhibit C; Dunlop Aff. at ¶5.


   10.    Dunlop disclosed none of these facts to Providence in 2008. *Kumar Tr.,*
136:5 -138:23.

    **RESPONSE:** Plaintiff denies the materiality of these facts.   Admitted that they
    were not disclosed because no one at Providence ever asked about them.
    Dunlop Aff. at ¶4.

11.    While employed at Lincoln Financial, Dunlop used his personal email to develop contacts in the healthcare industry. Dunlop Tr., 42:5-45:10.

**RESPONSE:**    Plaintiff denies the materiality of these facts, but otherwise admitted.

12.    In April and May 2008, Providence communicated with several Aetna employees, including Dunlop. *Kumar Tr.,* 73:4 - 74:7.

**RESPONSE:**   Admitted.

13.    Providence did product demonstrations for Aetna while Dunlop was employed there. *Id.; Dunlop Tr.,* 77:2-20.

**RESPONSE:**    Admitted.

14.    In June 2008, Providence presented to a large group at Aetna; Dunlop was not present for the majority of the meeting and did not appear to engage with the Aetna personnel responsible for selecting a vendor at all during the meeting. *Kumar Tr.,* 83:18 - 84:1.

**RESPONSE:**  Denied, Dunlop was present for the majority of the meeting. Dunlop Aff. at ¶7.

15.    Around that time, Dunlop told Kumar he could either help or harm Providence's business prospects with Aetna. *Kumar Aff.,* ^ 13; *Kumar Tr.,* 87:20 - 88:1,

89:13-22.

> **RESPONSE:**   Denied.   Kumar testified to this conversation as follows:
>
> Dr. Kumar:   I can't recall his exact words. He said something to the effect of: I am operating without a contract here. We need to get this replaced. And I am still at Aetna. Let's get this thing signed.
>
> Mr. Minchella: That is your best recollection of what he said?
>
> Dr. Kumar: Right.
>
> Mr. Minchella: You can't recall specifically?
>
> Dr. Kumar: No.
>
> (Kumar Dep. At 89, Exhibit B).
>
> And Dunlop testified that he never would have said that he had the means to prevent Providence from getting the business with Aetna and that he would not have influence the process at Aetna to prevent them from getting the Aetna Business. Dunlop Tr. At 138-139, Exhibit C.

16.    Obtaining Aetna as a customer was key to the survival of Providence and to its financing. *Kumar Tr.,* 98:20 - 99:9, 193:14-17; *Kumar Aff,* H 14.

> **RESPONSE:**   Admitted.

17.    Throughout this time, Dunlop (who was still an employee of Aetna and purportedly authorized to enter into agreements individually) and Providence were negotiating a marketing agreement whereby Dunlop (acting through Empower) would

market Providence products and generate sales for Providence. *Kumar Aff., ^* 15; *Kumar Tr.,* 103:24 - 104:13; *Brad Weinberg Deposition Transcript ("Weinberg Tr"),* 30:14-16;[5] *see also Dunlop Tr.,* 159:7-15.

> **RESPONSE:**   Denied because the statement of fact does not identify the time period.   Admit that the parties were discussing a marketing agreement from approximately April 2008 through the signing of the Marketing Agreement in June 2008.

18.    Empower is a limited liability company formed by Dunlop. Empower has no assets, no employees and does not conduct any business. Prior to June 15, 2008, Empower did not have any customers and generated no revenue. Other than commission paid to it by Providence, Empower has never generated any revenue. *Dunlop Tr.,* 85:13 - 87:6, 87:21-25, 93:23-24.

> **RESPONSE:**   Admit all except for whether Empower generated revenue, because Providence admits it paid Empower a commission on TASC.

19.    The original version of the contract was a form agreement Weinberg downloaded from the internet. *Weinberg Tr.,* 77:5-12.

> **RESPONSE:**   Admitted.

20.    In May and June 2008, the parties exchanged emails proposing amendments to the agreement. *Kumar Tr.,* 109:9-14; *Dunlop Tr.,* 213:16-214:3.

**RESPONSE:**   Admitted.


21.    A preliminary draft of the *Agreement* was modified to change the commission structure from account-based to product/program-based. *Dunlop* Jr., 215:9-11 ("It was changed, so it was based on products and programs sold.")

**RESPONSE:**   Admitted.


22.    On June 15, 2008, Providence and Dunlop (acting through Empower), executed a marketing agreement (the *"Agreement"*). *Dunlop Tr.,* 83:15-23; *Kumar Tr.,* 92:9-12; *Weinberg Tr.,* 107:3-4; *Kumar Aff.,* Ex. A.[6]

**RESPONSE:**   Admitted.


23.    Under the *Agreement,* Empower stated its intention to "market products and generate sales for [Providence]." *Kumar Aff.,* Ex. A (second "Whereas" clause).

**RESPONSE:**   Admitted that the Marketing Agreement contains that language.


24.    Empower agreed "to promote [Providence] and [Providence] Products to selected Customers ... and to conduct its business for Providence "honestly, ethically and in good faith." *Id.* § 7.

**RESPONSE:**   Admitted that the Marketing Agreement contains that language.

25.    In exchange, Providence agreed to pay Empower sales commissions pursuant to a two-tiered structure. First, "[f]or each product/program that [Empower] closes for a [Providence] product, a sales commission of 10% of the net sales revenue collected shall be paid to [Empower]." *Id.,* § 4. Second, "[f]or products sold through partnerships and relationships with, as examples, but not limited to: third party administrators, broker networks, health carriers, technology companies, wellness and disease management vendors, and other financial institutions where [Empower] provided an Introduction to [Providence] and in which the partner organization receives a referral commission, [Empower] will receive a 10% commission on net sales revenue (Net Revenue minus the partner's referral commission)." *Id.*

**RESPONSE:**    Admitted that the Marketing Agreement contains that language.

26.    The parties agreed to "pay and be responsible for their own costs and expenses incurred or arising in connection with their own performance" under the *Agreement. Id.,* § 6.

**RESPONSE:**    Admitted that the Marketing Agreement contains that language.

27.    The *Agreement* defined the parties' relationship as "independent contractors only," *id.,* § 10, and further provided that "[n]either Party will have the authority to enter into contracts, assume, create or incur any obligation or liability or make arrangements of any nature whatsoever for, in the name of, or on behalf of, the other Party." *Id.*

**RESPONSE:**    Admitted that the Marketing Agreement contains that language.

10

28.    The *Agreement* also stated that neither party shall be liable to the other "for any loss of profits, loss of business, loss of use or data, interruption of business, or for indirect special, incidental, exemplary, multiple, punitive or consequential damages of any kind, whether based on contract, tort (including, without limitation, negligence), warranty, guarantee or any other legal or equitable grounds  " *Id.,* § 12.

**RESPONSE:**   Admitted that the Marketing Agreement contains that language.


29.    Dunlop's expectation at the time Empower entered into the *Agreement* was that "if [Empower] didn't sale [sic] a product, [it] didn't get paid on it, or if [Empower] didn't sell a program, [it] didn't get paid on it." *Dunlop Tr.,* 215:1-7; *see also id.,* 185:20 - 186:1 ("I think that I wouldn't receive commissions if there was no significant effort placed, either by myself or my channel partners, in some form as part of the sales process, I wouldn't expect to receive a commission").

**RESPONSE:**   Admitted.


30.    In order to close, Empower was required to produce a potential customer ready and willing to purchase a Providence product whereby Providence needed only to formally complete the transaction with the customer. *Dunlop Tr.,* 215:4-7; *Kumar Tr.,* 163:12 - 164:2; *Weinberg Tr.,* 13:18-14:22.

**RESPONSE:**   Denied.   This is a legal interpretation of the language of the Marketing Agreement, and the cited deposition testimony.   Dunlop did not testify to this material fact as cited by Providence.   The Marketing Agreement

speaks for itself.   Moreover, Kumar's testimony provided a definition of close that it meant to "reach an agreement with a prospect to do business with Providence" which is internally inconsistent with the Marketing Agreement's language that "[n]either Party will have the authority to enter into contracts, assume, create or incur any obligation or liability or make arrangements of any nature whatsoever for, in the name of, or on behalf of, the other Party." See Statement of Material Fact ¶27, *supra*. Kumar Tr. at 163, Exhibit B.

31.    The partner organization "referral commission" was language that Dunlop requested be added to the *Agreement. Dunlop Tr., 2*15:18 - 216:17, Ex. E.

**RESPONSE:**  Admitted.

32.    Dunlop's employment was terminated by Aetna in August 2008 for lack of performance. *Dunlop Tr.*, 61:22 - 62:1.

**RESPONSE:**  Admitted.

33.    Dunlop had no direct communications with Aetna regarding Providence following his separation from the company and did not directly promote Providence products to Aetna. *Dunlop Tr.,* 349:20-23; *Kumar Tr.,* 239:20-24.

**RESPONSE:**   Admitted that Dunlop had no direct communications with Aetna regarding Providence following his separation from the company.   Denied the remainder.   The cited deposition testimony of Dunlop does not support that this is an undisputed fact.   Dunlop testified that he did not have "direct contact" with

anybody at Aetna to sell Providence products. And Kumar's testimony at this citation was "his understanding" that Dunlop had no communication with Aetna, and therefore could not have promoted Providence's products to Aetna.   Kumar refused to directly answer the question of whether Dunlop helped Providence promote products to Aetna, and therefore did not deny that fact.:

Q. Did he help you promote your products and services to Aetna?
A. I kept Dan in the loop as we went through the process of selling to Aetna.
Q. My question is, did he help you promote PHS's products to Aetna, yes or no?
A. He provided information and advice along the way.
Q. Did he help you promote your products to Aetna?
A. I am not sure if it was helpful or not, but he provided information and guidance along the way. I can't tell you whether the information he provided ended up helping or not.
Q. Did you feel it was helpful when you received the information?
A. I thought it might be helpful. After the fact, looking back, I am not sure if that information did help.

Kumar Tr. at 240, Exhibit B.

Kumar then admitted that Empower helped promote Providence's products to Aetna:

Q. Here is an e-mail from you to Dan Dunlop in May of 2009. You were asking him if Kroger is an Aetna plan sponsor, right?
A. Correct.
Q. You asked him that because you thought it would help you in your efforts to get a contract,right?
A. I asked him that because we had a logo slide in one of our presentations. And we had about 30 logos on that slide. And I wanted to know if Kroger was an Aetna client or not.
Q. Why did you want to know that?
A. So that if they were an Aetna client I would include the logo.

Q. You would include it because it would look good to Aetna?
A. Essentially.
Q. It would help Providence promote its products to Aetna, right?
A. It could.
Q. Showing you Plaintiff's Exhibit 8 for Kumar. Bottom e-mail from you to
Mr. Dunlop, March 30th, 2009. You were asking him for some insight on
any of PHS's clients who were Aetna plan sponsors, right?
A. Yes.
Q. Because you were looking for more information to help you promote
PHS's products to Aetna, right?
A.  Yes.

   Kumar Tr. at 241, Exhibit B.


  34. In September 2008, Providence provided Empower with
Providence's "Sales Handbook" which outlines, *inter alia,* Providence's sales
philosophy, a model sales timeline, the acquisition process and pricing
structure. *Weinberg Tr.,* 104:24 - 105:12; *Kumar Aff,* \ 17; *id.,* Ex B.

  **RESPONSE:** Admitted the referenced documents was provided to Empower,

  denied that it applied to Empower's Marketing Agreement. Dunlop was not an

  internal sales person, but had a separate Marketing Agreement. (Dunlop Aff.)

  Kumar told Dunlop that, for example, provisions in the Sales Handbook, such as

  leads expiring after 90 days, did not apply to him. (Dunlop Aff ¶17).


  35. Per the Sales Handbook, Providence's sales philosophy was clear that
"[l]eads and/or prospects should be followed through to conclusion of the relationship.
Either in the acquisition of the new client or determining after a series of contacts the
lead is not a viable candidate for our program." *Kumar Aff.,* Ex. B (Bates No.

EMP-DD001299).

**RESPONSE:**   Admitted the Sales Handbook contains that language.

36.   Empower claims 210 companies as potential sources for commission because Dunlop purportedly generated those entities as leads for Providence. *See Dunlop Tr.,* 164:17 -165:16; *see id.,* Ex. C; *see also id.* Ex. Q

**RESPONSE:**   Admitted, with the caveat that some of these companies were assigned to him as leads by Providence, and with the caveat that Exhibit C is not a piece of documentary evidence but is a court opinion.

37.   Only 12 of the 210 companies Dunlop claims to be Empower "leads" ever produced any revenue for Providence. *Affidavit of John McGuiness {"McGuiness Aff"),* f *1?*

**RESPONSE:**   Denied.  The McGuiness Affidavit does not state this fact, but rather states 13 of the 210 companies.

38.   Only 1 of those 12 revenue producing entities, TASC, purchased a Providence product as a direct result of Empower's efforts. *McGuinness Aff.,* ^ 8; *Kumar Tr.,* 166:2-16; *see also Dunlop Tr.,* 151:9-152:5, 153:20-154:2,155:22-156:21.

**RESPONSE:**   Denied. The McGuiness Affidavit does not state this fact, nor does the cited testimony establish this fact.   Rather Dunlop and Kumar collaboratively worked on TASC. *Dunlop Tr.,* 151:9-152:5, 153:20-154:2,155:22-156:21. Dunlop Aff. ¶18.

39.    Dunlop (acting through Empower) promoted a Providence product to a Company called TASC. Dunlop provided marketing materials to TASC, took a company representative out to dinner, and "workfed] on meetings, webinars, presentations and contract negotiations." *Dunlop Tr.,* 151:9 - 152:5. Dunlop concluded a negotiation for Providence with TASC, and, as a result of Dunlop's efforts, TASC became a Providence customer. *Id.* 151:9-12

> **RESPONSE:**    Admit the first sentence, deny that Dunlop concluded a negotiation for Providence with TASC, admit that as a result of Dunlop's efforts, and the efforts of Kumar and Providence, TASC became a Providence customer. Moreover, John McGuiness's affidavit states that "after negotiations with TASC were concluded" without, interestingly, identifying who concluded the negotiations. Dunlop Aff. ¶18.

40.    Pursuant to the *Agreement,* Providence paid Empower a 10% commission. McGuinness Aff. 1J9.

> **RESPONSE:**    Admitted.

41.    Dunlop had no contact with anyone at Blue Cross Blue Shield of Alabama ("BCBS Alabama"). *Dunlop Tr.,* 360:14 - 361:7. Empower did not receive approval from Providence to pursue that lead. *Id.,* 361:20-23, 362:24 - 363:2. Dunlop did nothing to convert BCBS Alabama into a Providence customer. *Id.,* 363:8-11.

> **RESPONSE:** Admitted.

42.    Dunlop had no contact with United Health Group and would only be entitled to commissions to the extent Travis Jackson closed the business and received a commission, which he did not. *Dunlop Tr.,* 366:9 -367:12; *KumarTr.,* 195:2-13,234:23-235:1.

> **RESPONSE:**   Denied.   If Travis Jackson had nothing to do with the sales
> process, promoting or marketing [Providence] to people at United Health Care,
> Dunlop would not be entitled to a commission.   Dunlop Tr., 367, Exhibit C.

43.    Blue Cross Blue Shield of California was closed by a former Providence employee. *John McGuinness Deposition Transcript ("McGuiness Tr"),* 52:22-53:2.

> **RESPONSE:**   Denied because the definition and meaning of the term "closed"
> in the Marketing Agreement is subject to more than one reasonable
> interpretation, and also because McGuiness did not testify to this fact, rather
> McGuiness, when asked if Ed Ross (a Providence employees) closed this
> account, replied "I want to say I believe so."   *John McGuinness Deposition*
> *Transcript ("McGuiness Tr"),* 52:22-53:2.

44.    Dunlop did no work for Kimberly Clark. *Dunlop Tr.,* 114:10-15. During his deposition, Dunlop could not recall the name of a contact at that company. *Id.,* 114:25 - 115:5.

> **RESPONSE:**   Admitted.

45.    Of the remaining 9 entities on Empower's leads list that have generated

revenue for Providence, Plaintiffs simply cannot refute that Empower did not introduce the entity to Providence and have a role in the closing of that business for Providence. *Kumar Aff.,* ffi[ 25-31.

> **RESPONSE:** Denied because the definition and meaning of the term "closed" in the Marketing Agreement is subject to more than one reasonable interpretation, and moreover, Kumar's testimony provided a definition of close that it meant to "reach an agreement with a prospect to do business with Providence" which is internally inconsistent with the Marketing Agreement's language that "[n]either Party will have the authority to enter into contracts, assume, create or incur any obligation or liability or make arrangements of any nature whatsoever for, in the name of, or on behalf of, the other Party." See Statement of Material Fact ¶27, *supra.* Kumar Tr. at 163, Exhibit B. Kumar stated that Dunlop was good at and had generated business for Providence. Dunlop Aff. ¶51, Exhibit 18 to Dunlop Aff.

46. Throughout Fall 2008, Providence and Dunlop were engaged in discussions regarding modification of the *Agreement* and Dunlop becoming an employee at Providence. *Kumar Tr.,* Ex. 2, 181:3-12, 183:2-5, 183:18 - 184:4, 185:17-23; *Dunlop Tr.,* Ex. G, 223:5 -227:1.

> **RESPONSE:** Admitted.

47. In December 2008, Providence decided not to extend an offer of employment to Dunlop. *Kumar Tr.,* 188:23 -189-12.

RESPONSE:   Admitted.

48.    In January 2009, Dunlop sent separate emails to two individuals he introduced to Providence, copying Weinberg and Kumar on both, informing them that he was no longer doing business with Providence. Kumar Aff., 1J18; *Dunlop Tr.,* Ex. M ("I regret to say that I will not be working with [Providence]. We were unable to come to terms and have decided to part ways."); *id.,* 250:2 - 252:6; *id.,* Ex. N ("With regret, I have to say that I will not be able to coordinate the relationship with [Providence]."); *id,* 252:12-253:25.

RESPONSE:   Admitted Dunlop sent the emails, but denied that this is a termination of the Marketing Agreement nor an anticipatory breach because it is not equivocal, nor was it Dunlop's intent to terminate the agreement. Dunlop Aff. ¶24.

49.    At that time, Dunlop informed another Empower lead that his relationship with Providence had "unwound." *Dunlop Tr.,* Ex. O.

RESPONSE:   Admitted.

50.    At that time, Dunlop began volunteering as an instructor for the NAHU wellness certification course. *Id.,* 267:4-15.

**RESPONSE:**   Admitted.

51.    In February 2009, Dunlop corresponded with Weinberg and confirmed that the parties would not be moving forward with either a new marketing agreement or an employment relationship and, therefore, were defaulting to the *Agreement. Dunlop Tr.,* Ex. U. Dunlop also acknowledged that the parties' business relationship was "interrupt[ed] but Empower was leaving the "door open to restoring our relationship should the opportunity present itself." *Id.* Dunlop's correspondence did not contemplate Empower continuing to seek business for Providence. *Id.,* 379:22-24.

**RESPONSE:**   Admitted.

52.    From December 2008 through Spring 2009 Dunlop did not develop any business for Providence. *Kumar Tr.,* 228:11-21.

**RESPONSE:**   Denied.   Dunlop and Kumar were working on new business for TASC in Spring 2009. Dunlop Aff. ¶52, Exhibit 19. Also, Dunlop was providing promotional assistant to Kumar for Aetna. Dunlop Aff. ¶37, Exhibit 4

53.    In Spring 2009, Providence and Dunlop resumed attempts to negotiate a new marketing agreement. *Dunlop* 7>., 318:10 — 319:3; *Kumar Tr., 221A* - 228:1.

**RESPONSE:**   Admitted.

54.    Providence was offering Dunlop a "leads based" agreement that would have compensated Dunlop for leads he generated for Providence, rather than paying commissions on products Empower closed for Providence since Empower was no longer marketing Providence products or programs. *Kumar Tr.,* Ex. 6, 227:4 - 228:1;; *Kumar Aff.,* U 20.

>    **RESPONSE:**   Admitted that Providence offered a "leads based" agreement, but denied the rest. Empower was continuing to work on promoting Providence products and programs. Dunlop and Kumar were working on new business for TASC in Spring 2009. Dunlop Aff. ¶52, Exhibit 19. Also, Dunlop was providing promotional assistant to Kumar for Aetna. Dunlop Aff. ¶37, Exhibit 4

55.    Despite engaging in discussions throughout 2009 and early 2010, the parties were unable to reach a new agreement. *Kumar Aff.,* ^ 21.

>    **RESPONSE:**   Admitted.

56.    Between approximately Summer 2009 through January 2010, Dunlop was formally affiliated with My Expert Solutions performing business development consulting. *Dunlop Tr.,* 89:6-90:10.

>    **RESPONSE:**   Admitted.

57.    Since 2010, Dunlop has been affiliated with Healthscape Partners, which

compensates him for business development. *Id.,* 94:12 - 96:10.

    **RESPONSE:**   Admitted.


    58.    Providence, through the significant efforts of Kumar, closed Aetna as a Providence customer in August 2009 (a year after Dunlop separated from Aetna). Kumar: (1) assembled and presented several Powerpoint presentations to Aetna; (2) made at least three onsite presentations; (3) negotiated a contract with Aetna representatives, including Aetna lawyers; (4) had hundreds of email exchanges and dozens of phone calls with various members of the Aetna team to customize the program for Aetna; and (5) worked with Weinberg to build specific functionality, *e.g.* a nutrition tracker, and then demonstrated that functionality to Aetna personnel. *Kumar Aff,* ^J 22.

    **RESPONSE:**   Denied.   Closed has been determined to be ambiguous and represents a genuine issue for trial.   Moreover, Providence has not produced in discovery the "hundreds" of emails exchanges with the Aetna team, therefore this part should be stricken from the Kumar Affidavit and the Statement of Material Facts.   Moreover, Empower promoted Providence's products to Aetna, provided important information to Kumar to help with the promotional efforts, including key business intelligence points, and meeting with Kumar and Weinberg prior to their first meeting with Aetna. Dunlop was providing promotional assistant to Kumar for Aetna. Dunlop Aff. ¶¶7,8 37, Exhibit 4. Also,

23

Kumar told Dunlop he would receive commissions on Aetna. Dunlop Aff. ¶10.

59.    In contrast, Dunlop (1) contacted Providence via its website while he was an Aetna employee; (2) had an initial call with Kumar and invited, on behalf of Aetna, Providence to do a demonstration for Aetna; (3) was present in the room as an Aetna employee at one of Providence's presentations onsite at Aetna, only for a short part of the meeting; and (4) after his employment was terminated by Aetna, occasionally offered tidbits of advice to Providence regarding how to work with Aetna. *Kumar Aff.,* \ 22.

> **RESPONSE:**   Denied. Empower promoted Providence's products to Aetna, provided important information to Kumar to help with the promotional efforts, including key business intelligence points, and meeting with Kumar and Weinberg prior to their first meeting with Aetna. Dunlop was providing promotional assistant to Kumar for Aetna. Dunlop Aff. ¶¶7,8 37, Exhibit 4. Also, Kumar and Zani told Dunlop he would receive commissions on Aetna. Dunlop Aff. ¶¶8, 10.

60.    Providence's position throughout has been that Empower did not close Aetna and, therefore, is not entitled to commission under the *Agreement. Kumar Tr.,* 225:24 - 226:1, 239:12-24, 248:5-12; *Zani Tr.,* 261:4-9.

> **RESPONSE:**   Denied.   Kumar and Zani told Dunlop he would receive commissions on Aetna. Dunlop Aff. ¶¶8, 10.

61.     Providence offered to pay Empower a percentage of the Aetna revenues as part of a global settlement agreement to resolve all matters between Dunlop, Empower and Providence. *ZaniTr.,* 273:3 -274:1.

**RESPONSE:**   Admitted.

62.    Travis Jackson ("Jackson") never produced any revenue for Providence. *Kumar Tr.,* 195:3-13.

**RESPONSE:**    Admitted.


63.    Dunlop was explicitly told by Jackson that he didn't do anything to generate revenue for Providence. *Dunlop Tr.*, 413:17-22.

**RESPONSE:**   Denied.   The cited deposition testimony does not support this fact.


64.    The "referral commission" was a provision that Dunlop requested be added to the *Agreement. Dunlop Tr.,* p. 216:1 -20.

**RESPONSE:**   Admitted.


65.    Providence products were not sold through a partner organization introduced to Providence by Empower where the partner organization received a referral commission. McGuinness Aff.,   TJ10; Dunlop Tr. 340:9-341:13.

**RESPONSE:** Admitted.


66.    The record reflects that the parties continued to cooperate and attempt to do business together through 2009 and into early 2010.[9]

**RESPONSE:** Denied that Providence cooperated. Admitted that they attempted to do business together as indicated by the referenced Exhibits (see footnote 9), and by Empower continuing to promote Providence's product and programs and by

Providence paying a commission on TASC. Admit that Empower continued to try to perform its obligations under the Marketing Agreement.

67.   Plaintiffs' access to its Providence email account was terminated when the relationship broke down in and around the end of December 2008 and the beginning of 2009.   McGuinness Aff. 1J11

> **RESPONSE:**   Admitted as to the time the email account was terminated, denied as to the remainder.   Dunlop was continuing to perform under the Marketing Agreement even through March 2009.   The email account was taken away the same time Kumar told Dunlop Travis Jackson would do business without him. Dunlop Aff. ¶9.

## PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACT

1.      Providence did not argue in its Motion to Dismiss that Rhode Island law applied to the interpretation of the Marketing Agreement. (Dkt. 13, Def's Memorandum of Law in Support of Providence Health Solutions, LLC's Motion to Dismiss).

2.      Providence did not move for reconsideration or reargument or otherwise object to the District Court's application of Connecticut law to the interpretation of the Marketing Agreement in its Ruling Denying Providence's Motion to Dismiss. (Court Dkt, Case 3:10-cv-01163-JCH).

3.      Providence's counterclaims are alleged under Connecticut law. (Dkt.

27

112, Def's Answer to First Amended Complaint and Counterclaim).

     4.     The Marketing Agreement was signed in Glastonbury, Connecticut. Dunlop Aff. ¶3.

     5.     The Marketing Agreement's language is not clear and unambiguous. (Dkt. 43, Judge Hall's Ruling Re: Motion to Dismiss, p.9).

     6.     Providence, through its founders and principals, signed the Marketing Agreement freely, voluntarily and not under duress. "Nobody held a gun to [Kumar and Weinberg's] head and said sign this agreement. There is always a choice." (Kumar Depo at 99, Exhibit B).

     7.     The Plaintiff, Empower Health, LLC is a Connecticut Limited Liability Company, with Plaintiff Daniel Dunlop as a member.   (Dkt. 28, Amended Compl. at ¶4, Dkt. 112, Counterclaim at ¶6).

     8.     The Defendant, Providence Health Solutions, LLC ("PHS"), is a corporate wellness company offering team-based wellness software and consulting services under the SUTN brand name.   (Dkt. 28, Amended Compl. at ¶5; Dkt. 112, Def.'s Answer at ¶5).

     9.     PHS and Empower executed a marketing agreement on June 15, 2008, a copy of which is attached to the Complaint as Exhibit A. (Dkt. 28, Amended Compl. at ¶7; Dkt. 112, Def.'s Answer at ¶7; Dkt, 118-7, Def.'s Rule 56 Statement in Support of Its Motion for Summary Judgment, at ¶22).

     10.     Weinberg had business experience prior to starting PHS (Weinberg

Depo. at p. 58, Exhibit A).

    11.    Weinberg's prior business experience included the following:

    a.    Weinberg started a company called "Interactive Solutions" in college designing websites, and also Event E-Management, which helped institutions including Brown University, Providence   College, Duke University, URI and others.   (Weinberg Depo. at 56-57, Exhibit A);

    b.    Weinberg was a founder and President of "Invest Together," a Brown University sponsored investment group.   Weinberg used lawyers for Interactive Solutions and Event E-Management.   (Weinberg Dep. At 59, Exhibit A).

    12.    Weinberg's father is an attorney.   (Weinberg Dep. at 40, Exhibit A).

    13.    Both Weinberg and Kumar were accepted into Brown University Medical School while still in high school, and did not have to take the Medical Entrance Exams. (Kumar Dep. at 73, Exhibit B; Weinberg Dep. at 47, Exhibit A).   Kumar even describes his business partner Weinberg as "often find[ing] himself as the smartest person in the room."   (Kumar Depo. at 49, Exhibit B).

    14.    Kumar had business experience, as well as access to legal counsel, prior to starting PHS including, when he was in high school, Kumar started a company -- with a business partner -- that sold posters on the internet called houseofposters.com, for which he filed a "dba" with the Town of Glastonbury, built a website complete with online store, and later sold that business on eBay for $4,000. He also bought and sold

domain names. (Id. at 19, 21, Exhibit B )

15.     While a Brown undergrad, Kumar started a 501(c )(3) nonprofit organization "Adopt A Doctor" to fund the salaries of doctors that work in poor countries.   (Kumar Dep. at 22, Exhibit B).

16.     Kumar completed the 501(c)(3) and also filed articles of incorporation with the secretary of state. (Kumar Dep. at 22, Exhibit B).

17.     Kumar's business partner in "Adopt A Doctor" was Ray Rickman, the former Deputy of State of Rhode Island and State Representative.   (Kumar Dep. at 25, 33, Exhibit B).

18.     In 2005, Kumar started "Shape Up Rhode Island" as a non-profit entity and used the services of an attorney in 2007 to address a legal claim arising out of the purchase of defective products.     (Kumar Dep. at 30, Exhibit B).

19.     In 2006 and 2007, Kumar used Gordon Fox as agent for service for Shape Up Rhode Island, a Rhode Island legislator and practicing attorney, whom he had known since 2003.   (Kumar Dep. at 57, Exhibit B).

20.     And even before Dunlop ever entered the picture, Kumar and Weinberg's business plan for Providence Health Solutions (or Shape Up) had won a contest, receiving $25,000 of "in-kind" legal services from a few high-powered law firms, including Ropes & Gray, Brown Rudnick and Hinckley Allen & Snyder.   (Kumar Dep. at 175-176, Exhibit B ).

21.     Kumar received an undergraduate degree from Brown in economics,

(Kumar Dep. at 18) and Weinberg received his from Brown in business economics. (Weinberg Dep. At 46).

22.     April 2008, Providence had 20-40 customers.   It generated 2008 revenue of about $700,000, largely from a contract it had with CVS Caremark, (Kumar Dep. At 65).

23.     Over the course of a year, Kumar and Weinberg negotiated the contract with CVS Caremark.   (Kumar Dep. At 66, 67).

24.     The first contact between PHS (Kumar) and Dunlop was as a result of PHS's marketing campaign which included Aetna Insurance Company, where Dunlop worked.   (Kumar Dep. at 70, Exhibit B ).

25.     Kumar first spoke with Dunlop in April 2008, for about 20-40 minutes (Kumar Dep. At 41, Exhibit B), two months before signing the Marketing Agreement (with Weinberg) on or about June 15, 2008. (Amended Compl. at ¶7; Def.'s Answer at ¶7; Def.'s Rule 56 Statement in Support of Its Motion for Summary Judgment, at ¶22).

26.     Kumar spoke with Dunlop probably a half dozen times between that first call and May 1, 2008 concerning Providence's product "Shape Up the Nation" and was speaking to other Aetna employees about Shape Up.   (Kumar Dep. at 73, Exhibit B ).

27.     Paul Coppola, was the person leading Aetna's process of looking at wellness vendors like Providence, (Kumar Dep. At 74), and Kumar knew Coppola had the most influence at Aetna surrounding that process.   (Kumar Dep. At 75).

28.     Prior to signing the Marketing Agreement, Kumar had conversations with

Dunlop wherein Dunlop expressed an interest in Providence, its philosophy and in bringing sales to Providence as an independent consultant.   (Kumar Dep. At 76).

29.    Though Kumar thought that was odd, given Dunlop's employment with Aetna, Kumar did not discuss this with Paul Coppola or anyone else.   (Kumar Dep. At 78).

30.    Kumar did, however, mention to Dunlop his feelings about Dunlop being employed by Aetna and dealing with Providence independently (potentially an Aetna vendor) but, as Kumar testified, Dunlop told him "he was planning to leave Aetna." (Kumar Dep. At 78).

31.    Kumar also recalled Dunlop telling him he was excited by a start-up company like Providence, and the opportunity to really make a difference.   (Kumar Dep. at 78, Exhibit B).

32.    Dunlop told Kumar that "he was planning to leave Aetna" but wanted something in place lined up.   (Kumar Dep. At 78, Exhibit B).   Kumar recalled that Dunlop told him these things – about his employment intentions – "very early on" and made it clear he was "intending to leave Aetna."   (Kumar Dep. at 79, Exhibit B).

33.    When Kumar asked Dunlop if he was still working at Aetna (because the communications were no longer through Dunlop's Aetna email account), Dunlop told Kumar he had left in a reluctant fashion and had been fired.   (Kumar Dep. at 80-81, Exhibit B ).

34.    The first draft of the Marketing Agreement came after a meeting between

Dunlop and Defendant's founders, Rajiv Kumar and Brad Weinberg, on May 12, 2008. (Weinberg Depo at 76, Exhibit A).

35.     Hours after the parties' meeting on May 12, 2008, Weinberg went on the internet and found a boilerplate marketing agreement from one of a few stock legal document websites, (Weinberg Dep. at 77, 78, Exhibit A), and sent it to Kumar with the intent that Kumar forward it on to Dunlop as a draft marketing agreement.   (Id.). (Exhibit B, Kumar Dep. at. 25).).

36.     Dunlop did not ask Kumar or Weinberg to provide a draft the same day as the meeting nor did he impose a deadline, and Kumar said he saw exciting opportunities for them.   (Kumar Dep. at 108, Exhibit B).

37.     Weinberg did not expect Dunlop to request changes to the draft marketing agreement but Dunlop "came back quickly and asked for changes." (Weinberg Dep. at 79, Exhibit A).

38.     There were several alterations of the draft marketing agreement between Mary 12, 2008 and June 15, 2008, when the Marketing Agreement was signed. (Kumar Dep. at 109, Exhibit B).

39.     There were "back and forth" communications about contract language. (Kumar Dep. at 111, Exhibit B).

40.     Kumar had time to comment on the agreement and could have called Attorney Gordon Fox or any lawyer to review it and nobody stopped him from doing that.   (Kumar Dep. at 130, Exhibit B).

41.     There is no evidence to support Providence's allegation at Paragraph 11 of its counterclaim that "Dunlop represented to Providence that by virtue of his position at Aetna he could damage its business relationship with Aetna if Providence did not cooperate with him personally," Kumar, who had the conversation with Dunlop where this alleged representation was made, testified when asked if Dunlop had made that statement, that:

> Dr. Kumar:  I can't recall his exact words.  He said something to the effect of:   I am operating without a contract here.   We need to get this replaced.   And I am still at Aetna.   Let's get this thing signed.
> Mr. Minchella: That is your best recollection of what he said?
> Dr. Kumar:   Right.
> Mr. Minchella:   You can't recall specifically?
> Dr. Kumar:   No.

(Kumar Dep. At 89, Exhibit B).

42.     "Nobody held a gun to [Kumar and Weinberg's] head and said sign this agreement.   There is always a choice."   (Kumar Depo at 99, Exhibit B).

43.     Attached to Dunlop's Affidavit as Exhibit 20 is a true and accurate copy of a document entitled "Exhibit A, Finder/Commission New Business Agreement," dated August 19, 2008, which is a list agreed upon by Providence and Empower to be listed as Partners, Clients and Customers as referred by Empower to Providence. (Dunlop Aff. Ex. 20).

44.     Kumar placed his initials in the column labeled "OK" indicating that Providence agreed and accepted that each of the entities listed in the column labeled

"Company" was either a Partner, Client and/or Customer referred by Empower to Providence. (Exhibit 20 to Dunlop Aff. Finder/Commission New Business Agreement)

45.     Aetna, Inc., is an entity listed in the column labeled "Company" on Exhibit A.   (Exhibit 20 to Dunlop Aff. Finder/Commission New Business Agreement, p. 1)

46.     Paul Coppola is listed as the contact for Aetna, Inc. on Exhibit A. (Exhibit 20 to Dunlop Aff. Finder/Commission New Business Agreement, p. 1)

47.     Empower Health, through Daniel Dunlop, introduced Providence to Paul Coppola at Aetna, Inc. (Exhibit 20 to Dunlop Aff. Finder/Commission New Business Agreement, p. 1)

48.     Integrated Financial Partners\Lincoln Financial Advisors is an entity listed in the column labeled "Company" on Exhibit A. (Exhibit 20 to Dunlop Aff. Finder/Commission New Business Agreement, p. 1)

49.     Joy Petterosi is listed as the contact for Integrated Financial Partners\Lincoln Financial Advisors on Exhibit A. (Exhibit 20 to Dunlop Aff. Finder/Commission New Business Agreement, p. 1)

50.     Empower Health, through Daniel Dunlop, introduced Providence to Integrated Financial Partners\Lincoln Financial Advisors and Joy Petterosi. (Exhibit 20 to Dunlop Aff., Finder/Commission New Business Agreement, p. 1)

51.     Healthways is an entity listed in the column labeled "Company" on Exhibit A. (Exhibit 20 to Dunlop Aff., Finder/Commission New Business Agreement, p. 1)

52.     Travis Jackson is listed as the contact for Healthways on Exhibit A. (Exhibit 20 to Dunlop Aff., Finder/Commission New Business Agreement, p. 1)

53.     Marketing in Motion is an entity listed in the column labeled "Company" on Exhibit A. (Exhibit 20 to Dunlop Aff., Finder/Commission New Business Agreement, p. 1)

54.     Travis Jackson and his wife, Jen Jackson are listed as the contacts for Marketing in Motion on Exhibit A. (Exhibit 20 to Dunlop Aff., Finder/Commission New Business Agreement, p. 1)

55.     Empower Health, through Daniel Dunlop, introduced Providence to Travis Jackson. (Exhibit 14 to Dunlop Aff.; Exhibit 20 to Dunlop Aff. Finder/Commission New Business Agreement, p. 1)

56.     My Wellchoice Plus is an entity listed in the column labeled "Company" on Exhibit A. (Exhibit 20 to Dunlop Aff., Finder/Commission New Business Agreement, p. 1)

57.     Scott Leavitt is listed as the contact for My Wellchoice Plus on Exhibit A. (Exhibit 20 to Dunlop Aff., Finder/Commission New Business Agreement, p. 1)

58.     Empower Health, through Daniel Dunlop, introduced Providence to My Wellchoice Plus and Scott Leavitt. (Exhibit 20 to Dunlop Aff., Finder/Commission New Business Agreement, p. 1)

59.     TASC is an entity listed in the column labeled "Company" on Exhibit A. (Exhibit 20 to Dunlop Aff., Finder/Commission New Business Agreement, p. 1)

60.     Jennifer Labrosso and Pamela Reynolds are listed as the contacts for TASC on Exhibit A. (Exhibit 20 to Dunlop Aff., Finder/Commission New Business Agreement, p. 1)

61.     Empower Health, through Daniel Dunlop, introduced Providence to TASC, Jennifer Labrosso and Pamela Reynolds. (Exhibit 20 to Dunlop Aff., Finder/Commission New Business Agreement, p. 1)

62.     ISU Network, ISU Financial Group, ISU Insurance Services is an entity listed in the column labeled "Company" on Exhibit A. (Exhibit 20 to Dunlop Aff., Finder/Commission New Business Agreement, p. 1)

63.     Kaye Chevalas and TJ Ryan are listed as the contacts for ISU Network, ISU Financial Group, ISU Insurance Services on Exhibit A. (Exhibit 20 to Dunlop Aff., Finder/Commission New Business Agreement, p. 1)

64.     Daniel Dunlop's intent in requesting the language regarding partner organization "referral commission" contained in Section 4 of the Marketing Agreement was to state that Empower's 10% commission would be calculated after the referral's commission was paid. *Dunlop Tr., 2*15:18 - 216:17.

65.     Daniel Dunlop's intent in requesting the language regarding partner organization "referral commission" contained in Section 4 of the Marketing Agreement was not to require a referral commission be paid to a partner organization as a condition precedent to Empower Health being entitled to a 10% commission. *Dunlop Tr., 2*15:18 - 216:17.

66.     On April 30, 2009, Brad Weinberg, then a principal of Providence, wrote in an email to Rajiv Kumar that it was "time to cancel the contract with him and move on." *Weinberg Tr.,* 119:15 - 119:20, Exhibit A; Exhibit 22 to Dunlop Aff.

67.     Weinberg, in his April 30, 2009 email, meant Daniel Dunlop and meant the Marketing Agreement.   *Weinberg Tr.,* 119:21 - 119:25, Exhibit A.

68.     The Marketing Agreement does not mention any process for pre-approval of leads.   Exhibit 23 to Dunlop Aff.

69.     Providence never formally ended the Marketing Agreement with Empower Health. Exhibits 8 and 22 to Dunlop Aff.

70.     Kumar believed, as of December 22, 2009, that Providence never formally ended the Marketing Agreement with Empower Health. (Exhibit 8 to Dunlop Aff.)

71.     On June 25, 2010, Rajiv Kumar sent Michael Zani the email attached as Exhibit 10 to the Dunlop Aff. in which Kumar wrote:

> Should we cancel the contract in writing now?  I know we are trying to say that we believe it was canceled a long time ago, but maybe we should consider canceling it again before we sign anything with health ways or anyone else on his "list."  That way at the most he can claim Aetna but that's about it.  I do not think we have deals with very many companies on his list.

72.     On June 26, 2010, Michael Zani responded to Kumar's June 25, 2010 email with an email attached as Exhibit 10 to the Dunlop Aff., in which Zani wrote:

We discussed this with counsel, but if we cancel it formally now, it might

give up the argument that it was effectively canceled when we got into heated debate in December 2008 and winter 2009.

73.     On March 27, 2009, Daniel Dunlop, on behalf of Empower Health, provided to Rajiv Kumar and Brad Weinberg, for their use in promoting Providence's product or program to Aetna, Inc., a 9 page single-spaced document he prepared called "Aetna Business Intelligence."   Exhibit 4 to Dunlop Aff.,.

74.     Mike Zani called Daniel Dunlop an "industry insider" in an email dated July 14, 2010, to individuals involved with Providence's attempt to obtain funding. (Exhibit 11 to Dunlop Aff., p.1, email from Zani to Hamel and Winder, dated June 26, 2010)

75.     Providence, through Kumar and Zani, promised Empower Health that Providence would pay it 10% commissions on Aetna, Inc.   (Dunlop Aff. at ¶10).

76.     Starting at least as early as September 2008, Providence was considering hiring Daniel Dunlop as an employee. (Exhibit 18 to Dunlop Aff. at p.2,)

77.     In December 2008, Kumar and Weinberg intended to offer Dunlop a position as an employee of Providence, and that among the several new hires Providence intended to make in 2009, Dan Dunlop was at the top of the list. Exhibit 3 to Dunlop Aff.

78.     Providence provided Travis Jackson, as an officer of My Expert Solution, with a Mutual Confidentiality Agreement which Providence labeled "Privileged & Confidential" in anticipation of discussions for My Expert Solution to sell, market or

promote the sale of Providence products or programs. NEED

79.     Travis Jackson signed the Mutual Confidentiality Agreement on July 15, 2010. (Exhibit 12 to Dunlop Aff. email from Travis to Zani, dated June 26, 2010, attaching signed Agreement dated July 15, 2010)

80.     Kumar emailed Travis Jackson on July 15, 2010 and wrote to him that he was excited that there may be an opportunity to work together again. (Exhibit 13 to Dunlop Aff. at p. 2)

81.     On July 21, 2010, Kumar emailed Mike Zani and wrote:

I just realized that we need to discuss the dan Dunlop issue with respect to Travis since dan made the intro and is 'claiming' Travis as an account.   Also Travis and dan work together so Dan will know if we are doing biz with Travis. Not urgent but something to think about.

(Exhibit 14 to Dunlop Aff., email from Kumar to Zani, dated July 21, 2010)

82.     Providence required Travis Jackson to agree to represent that Daniel Dunlop had nothing to do with the business Providence and Travis Jackson's company, My Expert Solution, were contemplating together. (Exhibit 15 to Dunlop Aff.,)

83.     Mike Zani, in an e-mail dated August 25, 2010, provided Travis Jackson with the language for him to represent, among other things, that Daniel Dunlop had nothing to do with the business Providence and Travis Jackson's company, My Expert Solution were contemplating together. ((Exhibit 14 to Dunlop Aff., email from Zani to Jackson, dated August 25, 2010)

84.     Travis Jackson, at Providence's request, signed a document, a true and accurate copy attached as Exhibit 16 to the Dunlop Aff., which states:

> MyExpertSolution, LLC hereby represents and technologies that any business relationship with Providence Health Solutions, Inc. and Providence Health Solutions, Inc.'s, successors and assigns, including Shape up, Inc.   (d/b/a shape of the nation), was initiated without the assistance of Daniel Dunlop or Empower Health, LLC.   Daniel Dunlop and Empower Health LLC played no role in referring, initiating or closing any business or contractual relationship between MyExpertSolution, LLC and Providence health solutions, Inc., its successors and assigns.

85.     On August 27, 2010, Ed Ross, on behalf of Providence, wrote Travis Jackson an e-mail in which he stated that Travis would not "need to shave off any of [his] pennies either" in connection with the above document.   (Exhibit 17 to Dunlop Aff. email from Ross to Jackson, dated August 27, 2010)

86.     Providence, through its attorneys, sent a letter dated July 19, 2010 to Daniel Dunlop, stating, among other things that, The Marketing Agreement was terminated on or around February 2, 2009, and that Empower Health did not close any agreements with any such clients on behalf of Providence. (Exhibit 21 to Dunlop Aff, letter from MacGillivray to Dunlop dated July 19, 2010)

87.     On August 9, 2009, Rajiv Kumar sent Dan Dunlop an e-mail informing Daniel Dunlop that Providence may "have a signed contract to celebrate on Thursday" with Aetna.    (Exhibit 7 to Dunlop Aff, email from Kumar to Dunlop, dated August 9, 2009).   Kumar promised Dunlop an honored seat at the table. Dunlop Aff. at ¶13.

88.     Rajiv Kumar made decisions regarding pricing for the sale of

Providence's products to TASC and whether to offer them a free pilot program. (Exhibit 18 to Dunlop Aff.; Dunlop Aff. at ¶18.

89.     The offer Mike Zani made to Daniel Dunlop to pay Empower Health 10% commissions on Aetna, and equity in Providence, required Empower Health to release Providence from claims to any other commissions under the Marketing Agreement. Dunlop Aff. at ¶19.

90.     On April 26, 2009, Daniel Dunlop sent Rajiv a letter which among other things told Kumar that:

> The idea that I, personally, would have to "close" a lead is nonsensical. You would not have the lead to close if it weren't for my introduction and my ongoing intensive work to bring these relationships to signing an agreement. However, in each case so far, you have stepped in to take over the negotiations and finalize the transaction to the point of interfering with my ability to manage each relationship and all the leads. Under this scenario I have no ability to "close" the lead. I am paid when the lead is closed.

Exhibit 6 to Dunlop Aff. Letter from Dunlop to Kumar dated April 26, 2009, p. 1

91.     In the April 26, 2009 letter Dunlop also told Kumar that he remained committed to managing the relationships he had introduced to Kumar and the resulting pipeline of business, under the current contract. Exhibit 6 to Dunlop Aff., Letter from Dunlop to Kumar dated April 26, 2009, p. 1

92.     Mike Zani told Dunlop that he was frustrated in his performance of the Marketing Agreement by the actions of Kumar. Dunlop Aff. at ¶12.

93.     Providence interfered with and prevented Empower from performing under the Marketing Agreement. (Dunlop Aff. at 21,22, 25-28, 32, 33).

THE PLAINTIFFS.
EMPOWER HEALTH LLC and
DANIEL DUNLOP


By:_____/s/ CT 18890_____
  Anthony R. Minchella (ct18890)

Minchella & Associates, L.L.C.
530 Middlebury Road, Suite 209B
Middlebury, CT   06762
(203) 758-1069 (Telephone)
(203) 758-2074 (Facsimile)
aminchella@minchellalaw.com (E-Mail)

**CERTIFICATION**

I certify that on this date a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the notice of electronic filing.   Parties may access this filing through the Court's CM/ECF system.

_____/s/_____CT 18890_____

Anthony R. Minchella